IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| KEVIN CROUSE, GINGER CROUSE, and STEVE WEBER, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | CAUSE NO. 07-CV-00031-WDS |
| CROSSROADS WORKFORCE INVESTMENT BOARD and THERESE McMAHON, individually, | ) ) ) ) ) | |
| Defendants. | ) | |

## MEMORANDUM & ORDER

**STIEHL, District Judge:**

Before the Court is defendant Crossroads Workforce Investment Board's (Crossroads) motion for summary judgment on Count I of plaintiffs' complaint (Doc. 52), to which plaintiffs have filed a response (Doc. 55), and defendant a reply (Doc. 60).

## BACKGROUND

Crossroads provides workforce development programs to employers and employees in fourteen Illinois counties. The Illinois Department of Commerce and Economic Opportunity (DCEO) is a state agency which distributes federal Workforce Investment Act (WIA) funds to organizations throughout Illinois, including to Crossroads. Between July 1, 2003, and November 16, 2005,[1] Crossroads employed plaintiffs Ginger Crouse, Kevin Crouse, and Steve Weber at its corporate office in Marion County, Illinois. Defendant asserts that in mid-2005 plaintiffs' management of Crossroads was so substandard that the State agency overseeing

---

[1] Plaintiffs' Complaint states that each plaintiff was employed between "July 1, 2003 and November 16, 2003." *See* Compl. at ¶ 14. However, the complaint also states that all three plaintiffs were terminated on November 16, 2005. *See* Compl. at ¶ 31.

Crossroads was forced to retain an independent CPA/management consulting firm to conduct an audit. As a result of the audit, in excess of $750,000 in losses and errors were identified, and plaintiffs were subsequently terminated.

Plaintiffs filed this action alleging violations of Title VII of the Civil Rights Act of 1968, 42 U.S.C. § 1983, claiming that the defendant retaliated against plaintiffs for filing unlawful discrimination claims against Crossroads and the Illinois Department of Commerce and Economic Opportunity. The only remaining count is plaintiffs' claims against defendant Crossroads in Count I, which alleges retaliation in violation of Title VII for engaging in a protected activity.[2]

Summary judgment is appropriate where items contained in the record "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); see also *Celetox Corp. v. Catrett*, 477 U.S. 317, 322-323 (1996); *Popovits v. Circuit City Stores, Inc.*, 185 F.3d 726, 731 (7th Cir. 1999). The moving party bears the burden of demonstrating the absence of a dispute as to material facts. *Celotex* at 323. Once the movant has produced evidence sufficient for summary judgment, the non-moving party bears the burden to demonstrate that there remains a genuine issue of material fact. *Johnson v. City of Fort Wayne*, 91 F.3d 922, 931 (7th Cir. 1996). Only disputes with regard to an outcome determinative fact represent a genuine issue of material fact sufficient to defeat summary judgment. *Clifton v. Schafer*, 969 F.2d 278, 281 (7th Cir. 1992).

---

[2]The Court previously dismissed plaintiffs' claims against defendant Theresa McMahon finding that she was entitled to qualified immunity because the plaintiffs' § 1983 claims did not assert any constitutionally protected rights, and the Court further declined to exercise supplemental jurisdiction over plaintiffs' state law claim in Count III. Count II sought recovery against McMahon individually for alleged deprivation of various constitutional rights including First Amendment, equal protection, and due process rights; and Count III sought recovery against McMahon individually for the state law claim of intentional infliction of emotional distress (See, *Memorandum & Order* at Doc. 35).

Crossroads seeks summary judgment on the grounds that plaintiffs have not set forth a prima facie claim of retaliation, but that even if they could establish such a claim, they were discharged for legitimate, non-discriminatory and non-retaliatory reasons.

1. **Evidence of Mismanagement**

Crossroads asserts that before August of 2005, complaints about the management of Crossroads were common. Crossroads' staff complained to the DCEO about the plaintiffs' management team, including mismanagement, failure to show up for work, failure to return telephone calls, lack of oversight, lack of services and lack of direction to the staff. (Exh. G to Doc. 52). Crossroad's Board Chair, Bob Dugan, and three of the community college presidents contacted former defendant McMahon expressing additional concerns about the management of Crossroads (Exh. F, pp. 21, 25).[3] Other complaints were that there was no planning in the Critical Skills Shortage Initiative grant, and that the products were inferior (*Id.* at p. 23). In December of 2005, three of the community college presidents (from Lake Land CC, Kaskaskia CC and Eastern Illinois CC) requested a meeting to express their concerns about the management and operation of Crossroads (Exh. G, pp 11, 22-23).

DECO conducted an audit of payroll, procurement, and time and attendance records (Exh. G, pp. 10, 22, 95-96) which revealed multiple violations and concerns, including protocol violation of the requirements of WIA (Exh. I). A further management audit was thereafter conducted by an outside firm in August of 2005.(Exh. I). An incident report was filed with the United States Department of Labor (Exh. G, p. 61).

---

[3] All of the community colleges have an interest in the running of the Workforce Board as they train a majority of the clients who go through the system. (Exh. F, pp. 9-15).

### 2. Plaintiffs' Discrimination Complaints

Prior to this procedure, on December 8, 2004, Ginger Crouse filed with the Illinois Department of Commerce and Economic Opportunity complaints of sexual discrimination, sexual harassment, and retaliation by Crossroads board member, Jerry Michels. She also complained of similar retaliation by board member, Marva Green, who took no action in regard to Crouse's complaint of sexual harassment that she and other women working at Crossroads suffered from inappropriate treatment by Michels.

The complaint was investigated by Erin Davis, a lawyer and equal opportunity officer employed by the Illinois Department of Commerce and Economic Opportunity. During Davis's investigation, Kevin Crouse and Steve Weber were interviewed as witnesses. Both supported Ginger Crouse's complaint. Davis found that Ginger Crouse had been subject to gender discrimination and unlawfully retaliated against, and recommended that Michels and Green either voluntarily resign or be removed from their Crossroads board positions.

On June 22, 2005, the Crossroads board met, and Green and Michels were forced to resign from their board positions. This terminated the claims. The plaintiffs acknowledge that Crossroads complied with all recommended corrective action which was part of the Notice of Final Action issued by investigative officer Davis.

Subsequently, on November 16, 2005, the Crossroads board held a closed meeting, and the board voted to terminate all three plaintiffs. Plaintiffs filed charges with the Equal Employment Opportunity Commission and received timely right to sue letters.

Plaintiffs assert that they were terminated because they had filed claims with the EEOC against the Board members, and therefore the terminations were retaliatory actions. Defendant asserts that plaintiffs were terminated because the failed audit reports revealed that there were

significant deficiencies in the areas of conflict of interest, procurement, financial management, personnel and organizational staffing.

### A. Ginger Crouse Suit

Plaintiff Ginger Crouse alleges that she was discriminated against because she filed her complaint. As evidence of this, she alleges that Bob Dugan, before the complaint was filed, was friendly, but thereafter changed his interaction with her (Exh. E. pp. 154-55; 164-65). She asserts that his familiarity with fired board members Michels and Green forms the basis for this retaliation and treatment. The record reveals that in mid-summer of 2005, after the filing of the discrimination suit and after Michels and Green were terminated, Ginger Crouse received a favorable review, and a $10,000 annual raise, and that Dugan served on Crossroads' executive committee, which recommended the raise.

### B. Kevin Crouse Suit

Kevin Crouse alleges that he was retaliated against and terminated as a result of his wife's discrimination complaint, as well as his participation in other EEOC investigations (Exh. W).[4] He claims that after the resignations of Michels and Green, as an act of retaliation, it was proposed that a management audit of Crossroads be conducted. He claims that Dugan, after the August 4, 2005, meeting undermined Kevin Crouse's authority, and finally that he, and the other plaintiffs, were not allowed to defend themselves or otherwise speak at the November 2005 meeting where they were terminated.

---

[4]These other investigations involve claims of age discrimination brought by employees of Lake Land Community College.

### C. Steve Weber Suit

Weber's only claim of retaliation is that he was terminated on November 16, 2005. He asserts that because he did not agree with Crossroads' decisions as to Ginger Crouse, and "signed in support" of her, he was targeted for retaliation by defendant Crossroads, that Dugan was "out to get him," and he was terminated.

### DISCUSSION

To support a claim of retaliation, plaintiffs can make either a direct or indirect showing. Plaintiffs assert that they have proved both the direct and indirect methods of showing unlawful retaliation. Under the direct method, an employee must demonstrate that (1) he engaged in statutorily protected activity; (2) he suffered an adverse action taken by his employer; and (3) there was a causal connection between the statutorily protected activity and the adverse action. *Andonissamy v. Hewlett-Packard Co.*, 547 F.3d 841(7th Cir. 2008).

Under the indirect method, a plaintiff must prove that (1) he engaged in statutorily protected activity; (2) he met his employer's legitimate expectations; (3) he suffered an adverse employment action; and (4) he was treated less favorably than similarly situated employees who did not engage in statutorily protected activity. *Tomanovich v. City of Indianapolis,* 457 F.3d 656, 662-63 (7th Cir.2006).

#### 1. Direct Method of Proof

Proof of discrimination under the direct method "is not limited to near-admissions by the employer that its decisions were based on a proscribed criterion." *Luks v. Baxter Healthcare Corp.,* 467 F.3d 1049, 1052 (7th Cir.2006). Rather, an employee also can make a direct method showing through the use of circumstantial evidence "which suggests discrimination albeit through a longer chain of inferences." *Id.* Under the direct method of proof, the evidence,

6

whether direct or circumstantial, must, "'point[] directly' to a discriminatory reason for the employer's action." *Burks v. Wis. Dep't of Transp.,* 464 F.3d 744, 751 n. 3 (7th Cir. 2006). There are three categories of circumstantial evidence which can establish discrimination under the direct approach. *Venturelli v. ARC Cmty. Servs., Inc.,* 350 F.3d 592, 601 (7th Cir. 2003). The first is "suspicious timing, ambiguous oral or written statements, or behavior toward or comments directed at other employees in the protected group." *Troupe v. May Dep't Stores Co.*, 20 F.3d 734, 736 (7th Cir. 1994) (see also, *Hemsworth v. Quotesmith.Com, Inc.,* 476 F.3d 487, 491 (7th Cir. 2007). The second type requires a showing that the employer systematically treated other similarly situated employees better. 20 F.3d at 736. The third category includes evidence "where the plaintiff is qualified for and fails to receive the desired treatment, and the employer's stated reason for the difference is unworthy of belief." *Kennedy v. Schoenberg, Fisher & Newman, Ltd.,* 140 F.3d 716, 725 (7th Cir. 1998) (internal quotation marks and citation omitted).

Although plaintiffs make a claim that they have shown direct method proof, the Court is not so persuaded. Plaintiffs have submitted testimony of 5 of the Board members who indicated that the plaintiffs were terminated as a result of their protected activities (Doc. 55, Exhs. A-E). The Court **FINDS**, however, that this evidence does not support plaintiffs' claim. First of all, these Board members did not vote to terminate plaintiffs and are only speculating as to the reasons why other Board members *may* have voted. Although it is clear that the defendant, Crossroads, could only act through its Board, evidence not founded on personal knowledge is not admissible to show retaliation. Certainly, purely speculative beliefs of other members of the Board does not amount to evidence of retaliation, even under any of the three circumstantial methods of establishing direct proof. The Court, therefore, **FINDS** that the plaintiffs' evidence of other Board members does not amount to direct evidence of retaliation.

Plaintiffs also assert that they can establish an "unbroken chain" of events which demonstrate direct method retaliation proof. They note that Ginger Crouse filed her original discrimination charge in December of 2004, Michels and Green were terminated in June or July of 2005, a management was thereafter ordered, and that plaintiffs were only given 10 days to respond to the September 2005 audit report. The final report was issued on November 11, 2005, and plaintiffs were terminated on November 16, 2005. Plaintiffs assert that the actions of Crossroads were calculated to create a cover for retaliation. Although this is a chain of events, that chain does not, without specific direct evidence, amount to retaliative actions. Therefore, the Court **FINDS** that plaintiffs have not established retaliation under the direct method of proof.

2. **Indirect Method of Proof**

Under the indirect method, an employee must establish a prima facie case by proving that they (1) engaged in a statutorily protected activity; (2) met their employer's legitimate expectations; (3) suffered an adverse employment action; and (4) were treated less favorably than similarly situated employees who did not engage in statutorily protected activity. *Nichols v. S. Ill. Univ.-Edwardsville,* 510 F.3d 772, 784-85 (7th Cir. 2007). Once the prima facie case is established, the burden shifts to the employer to produce a non-discriminatory reason for its action; if the employer meets this burden, the burden shifts back to the employee to demonstrate that the proffered reason is pretextual. *Id.* at 785.

Even assuming that plaintiffs have established that they were retaliated against under an indirect method of proof, the Court **FINDS** that Crossroads has established a clear, legitimate non-discriminatory reason for their termination. The plaintiffs' claims of retaliation simply cannot override the fact that once an independent management audit was conducted, significant

evidence of mismanagement was uncovered.[5]  Plaintiffs qualify this audit process as a "witch hunt" designed to find a basis for their termination.  Even if the audit was somehow prompted by the discrimination claims, the Court is hard-pressed to imagine a better, legitimate, non-discriminatory reason for termination than the clear evidence of mismanagement that existed in this case.  The audit was independent, the results were overwhelmingly clear.  The audit revealed that the plaintiffs, who were responsible for the management of Crossroads, had grossly mismanaged the institution.  Their termination was warranted under these facts.

Accordingly, the Court **GRANTS** defendant's motion for summary judgment.

Judgment is entered in favor of defendant Crossroads Workforce Investment Board and against plaintiffs Ginger Crouse, Kevin Crouse, and Steve Weber on Count I of the Complaint.

The Clerk of the Court is **DIRECTED** to enter judgment accordingly.

**IT IS SO ORDERED.**

**DATE: January 7, 2009.**


                                           **s/ WILLIAM D. STIEHL**
                                           **District Judge**

---

[5] The record as discussed reveals that there were numerous procurement violations; conflicts of interest; financial mismanagement; personnel and organizational staffing issues.  Potential questionable costs amounted to approximately $750,000.